UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

STEPHEN D. ALBRECHT,

                Plaintiff,

     v.                                             Case No. 13-C-0709

CAROLYN COLVIN,

                Defendant.

---

## DECISION AND ORDER

---

This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Stephen D. Albrecht's application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Albrecht challenges the decision by the Administrative Law Judge (ALJ) denying him benefits because substantial evidence does not support the ALJ's decision and the ALJ failed to follow Social Security Administration (SSA) rulings and regulations. In particular, Albrecht contends that the ALJ erred in assessing Albrecht's credibility, relying on the opinion of a consulting physician, identifying and relying upon a medical opinion by his treatment provider, and failing to indicate the frequency of a sit/stand option to the Vocational Expert (VE). For the reasons that follow, the decision of the Commissioner will be affirmed.

## BACKGROUND

Albrecht filed an application for benefits on August 21, 2009, alleging disability due to arthritis of the spine and left hip, pain following heart surgery, and a hernia. His alleged onset date was April 1, 2009. He was 50 years of age at the time. The record indicates that Albrecht first

starting having pain in his hip and back in 1998, (Tr. 150), though he does discuss an even earlier back injury when he was 17 to at least one medical provider, (Tr. 231–32).

Regardless of when these symptoms first arose, the earliest medical evidence in the record dates from late 2006. (Tr. 239.) These early records from Outreach Healthcare in October 2006 mention a variety of problems—diarrhea, depression, and substance abuse—that are not relevant for this appeal and are not the basis for Albrecht's disability application. (Tr. 235–39.)

Following these early records, the record of medical care is non-existent until April 23, 2008, when Albrecht again sought care at Outreach Healthcare. (Tr. 234.) On this date, Albrecht visited the clinic for a TB test, but he denied any other significant medical history or current problems. (*Id.*) A week later, Albrecht returned to Outreach Healthcare complaining about pain in his right knee. (Tr. 233.) He denied any acute injury to his knee; he suggested instead that the pain was attributable to new shoes and pain in his left hip which caused him to put more pressure on his right leg. (*Id.*) It is not clear what, if any, treatment Albrecht received based on these complaints. (*Id.*)

Again, following this appointment, there is a large gap in the medical record until January 23, 2009, when Albrecht visited the St. Vincent Hospital Emergency Room complaining of right knee pain following a fall on some ice. (Tr. 219.) He was diagnosed with a contusion and possible ligament strain after x-rays showed no fracture; his treatment consisted of an ace wrap, immobilizer, ice, and ibuprofen and Vicodin for pain. (Tr. 219, 221.) Albrecht did not complain of pain related to his hip, back, or groin during this visit to the Emergency Room, though the physical examination noted that his "[l]eft leg moves well without tenderness or deformity." (Tr. 219.) There is no record of follow-up care, despite the fact that a reevaluation with an orthopedist was recommended. (*Id.*)

A few months later, Albrecht returned to Outreach Healthcare complaining of pain in his left hip and lower back. (Tr. 231.) Specifically, Albrecht stated that he had suffered an unidentified back injury at the age of 17 and, but for a mistake, would have been on disability since that time. (*Id.*) He further complains that his hip has "popped out" and not been treated. (*Id.*) Finally, he indicated that he believed that he had torn the mesh used to repair a hernia several years earlier. (*Id.*) Mary Blankenheim, a nurse practitioner, treated Albrecht. It is not clear what course of treatment Blankenheim recommended, though she did note that Albrecht intended to file for social security disability. (Tr. 231.) Albrecht saw Blankenheim again on March 11 for a follow-up appointment and again complained of pain in his right groin associated with the repair of his hernia. (Tr. 226.) Blankenheim referred him for diagnostic imaging and to Dr. Hinckley and Dr. Saletta for his complaints. (Tr. 227–31.)

Based on the referral by Blankenheim, Albrecht had x-rays of his hip and lumbar spine completed on March 6, 2009. (Tr. 249–50.) The x-ray of both hips showed they had "a symmetric and essentially unremarkable appearance" and the "SI joint [was] grossly unremarkable." (Tr. 249.) The x-ray of Albrecht's lumbar spine showed mild right convexity curvature and slight spurring. (Tr. 250.) While there was "some atherosclerotic vascular calcification," no major disc space narrowing was noted. (*Id.*) An MRI of Albrecht's lumbar spine on March 12, 2009, similarly showed mild right convex lumbar scoliosis. (Tr. 247.) The MRI also revealed mild broad based disc bulges at multiple levels and a small annular tear at L4-5. (*Id.*) The most significant findings were at L4-5 and L5-S1 where moderate broad based disc bulges were noted. (*Id.*) Albrecht was assessed to have "[m]ultilevel degenerative disc disease most notable at L4-5 and L5-S1." (*Id.*)

Dr. Charles Saletta examined Albrecht on March 17, 2009, regarding the possible hernia. (Tr. 245.) During the appointment, Albrecht informed Dr. Saletta that he had had bilateral inguinal hernias repaired laparoscopically several years earlier but that just two months after that surgery he thought he aggravated the right side. (*Id.*) Upon exam, Dr. Saletta noted a "definite bulge that extends to the external ring and is tender on palpation but very easily reducible." (Tr. 246.) He diagnosed Albrecht with a "recurrent right inguinal hernia" and recommended repair. (*Id.*) Dr. Saletta advised Albrecht not to do any heavy lifting—more than 15 to 20 pounds—until the hernia was repaired. (*Id.*) Dr. Saletta did note that the surgery would be elective, but that by failing to have the procedure Albrecht ran the risk of an incarcerated or strangulated hernia, which would require an emergency operation and possible bowel resection. (*Id.*) Albrecht indicated that he would look into a payment plan, but it is not clear if he ever did so. (*Id.*)

Albrecht saw Dr. Hinckley on March 26, 2009. (Tr. 225.) Although Dr. Hinckley's notes are difficult to read, he appears to diagnose Albrecht with a soft tissue injury to his back and hip. (*Id.*) He recommended physical therapy for the soft tissue injury and declined to prescribe narcotic pain medication despite Albrecht's request. (*Id.*) A follow-up appointment with Blankenheim on March 30, 2009, reiterates Dr. Hinckley's diagnosis and conservative treatment plan, as well as that of Dr. Saletta regarding the hernia. (Tr. 234.)

During his final visit to Outreach Healthcare on April 13, 2009, Albrecht requested a refill of his pain medication, Tylenol with codeine, and indicated that he was "bleeding out" because he "'torn something on his [left] side." (Tr. 223.) It is not clear what course of treatment Blankenheim recommended regarding this complaint. (*Id.*)

4

The next day Albrecht went to a new physician, Dr. John Koch. (Tr. 241.) During his appointment with Dr. Koch, Albrecht complained primarily about his hip and lower back pain. (*Id.*) Dr. Koch reviewed the 2009 MRI of Albrecht's lower back, which showed "mild to moderate degenerative disk disease of the lumbar spine." (*Id.*) X-rays of Albrecht's spine showed good alignment and some evidence of degenerative changes according to Dr. Koch. (Tr. 242.) X-rays of his hip demonstrated "mild arthritic changes bilaterally" based on Dr. Koch's reading, in contrast to the opinion of the radiologist who opined the hips were essentially unremarkable. (Tr. 241–42.) Upon physical exam, Dr. Koch noted limited range of motion of the hip, especially on the left side, and pain. (Tr. 242.) Physical exam of the lower back "showed mild deficits and some increased back pain during hyperextension . . . and forward flexion of the spine." (*Id.*) Dr. Koch assessed that Albrecht's lower back pain was most likely attributable to mild to moderate degenerative disc disease and the hip pain was caused by mild arthritis. (Tr. 243.) He also opined that Albrecht had significant restrictions of range of motion, trochanteric bursitis, tightness of the iliotibial band, and a sacral lesion. (*Id.*) Based on these findings, Dr. Koch refilled Albrecht's prescription for Tylenol with codeine. (*Id.*) He also recommended physical therapy, which Albrecht declined. (*Id.*) Finally, Dr. Koch noted that Albrecht's "main goal today for him was to have me document his impairments at the back and hip area" for disability purposes. (*Id.*)

After Dr. Koch's assessment, the medical record is again sporadic. On August 25, 2009, Albrecht visited the St. Francis Community Clinic requesting pain medication. (Tr. 252.) The clinic refused his request because it does not provide narcotic prescriptions. (*Id.*) Albrecht was upset when he left the clinic. (*Id.*)

Three months later, on October 8, 2009, Albrecht was seen by Sara Kolell, a nurse practitioner with Affinity Medical Group. (Tr. 259–60.) Albrecht went to the clinic because he had been denied narcotics at the Urgent Care. (Tr. 259.) He complained of lower back pain, hip pain, and pain associated with his hernia. (*Id.*) He informed Kolell that "he needs narcotic pain medication to barely touch the pain." (*Id.*) She reviewed his 2009 lumbar spine MRI, concluding that he "has some osteoarthritis type changes, but nothing significant." (Tr. 259–60.) Kolell informed Albrecht that she recommended non-steroidal anti-inflammatory drugs and muscle relaxants for chronic back pain of this sort. (Tr. 260.) Albrecht became very upset as a result. (*Id.*) She also offered to refer him to an orthopedist for injections or a pain clinic for pain medication management, but Albrecht gathered his things and left the room upset before she provide him with the referrals. (*Id.*)

Two days later, Albrecht returned to the Urgent Care specifically seeking a refill of a hydrocodone prescription. (Tr. 257.) He was seen by Dr. Jose Dias. (*Id.*) Albrecht informed Dr. Dias that he had only two pills left from a prescription for 50 hydrocodone by Dr. Smrecek on September 23, but he did not have an appointment until October 22 with a Dr. Patel, who had left the system. (*Id.*) Dr. Dias discussed the chronic pain medication policy and scheduled Albrecht to see another physician, Dr. Rocke, on October 27. (*Id.*) Dr. Dias "gave [Albrecht] the benefit of the doubt this time" and gave him 50 hydrocodone, with instructions to take no more than three a day. (*Id.*)

On October 27, 2009, Albrecht went to his appointment with Dr. Rocke. (Tr. 255.) He again asked for a refill of his narcotic pain medication. (*Id.*) Dr. Rocke noted that Albrecht was tender in the left inguinal region, but he found no evidence of hernia. (*Id.*) He also noted that the

6

straight leg raise was negative, the spine was midline, and muscle strength in the lower extremities was "5 out of 5." (*Id.*) Dr. Rocke provided Albrecht with 45 hydrocodone, with instructions to take no more than three in a day. (*Id.*) He recommended reevaluation of the inguinal pain. (Id.)

Albrecht's medical record is silent following this October 2009 treatment until an operative report from Froedtert Medical Center dated September 1, 2010. (Tr. 276.) The operative report describes Albrecht's heart surgery to repair an aortic dissection and replace the aortic valve. (Tr. 276–78.) The report contains no detail about Albrecht's post-operative status, aside from noting that a chest x-ray was within limits following the procedure. (Tr. 278.)

Following his heart surgery, Albrecht began seeing Heidi Blair, a nurse practitioner with Aurora Health Care, on October 1, 2010. (Tr. 286.) During that appointment, Albrecht complained of lower back pain and arthritis in his left hip. (*Id.*) He again requested narcotic pain medication, which Blair refused to prescribe. (Tr. 287.) She noted that Affinity's records included "several documented phone conversations with [Albrecht] requesting reorders on his narcotics. They felt he was not using those appropriately and he was advised, per a phone record, 01/07/20101 [sic] to find a new provider." (Tr. 286.) Blair also stated that the clinic "had contacted the patient previous to this visit to request records and after reviewing the records from Affinity, patient was advised not to expect narcotics today. But we could discuss alternative ways to manage his pain." (*Id.*) She noted that Albrecht had BadgerCare for insurance. (*Id.*) Albrecht informed Blair that he had "chest discomfort with exercise," but no acute chest pain or shortness of breath. (Tr. 288.) He did not request reorders of his medication related to his heart or heart surgery. (Tr. 289.)

Albrecht had a final x-ray of his left hip on October 5, 2010, ordered by Blair. (Tr. 284.) The report indicates that the bone is "normally mineralized," there is no fracture or dislocation, and

no bony destructions. (*Id.*) The report also indicates that the "soft tissue is unremarkable." (*Id.*) Dr. Xue Wang who read the x-ray opined that there was "[n]o acute bony abnormality." (*Id.*)

Albrecht saw Blair for a second and final time on October 25, 2010. (Tr. 281.) Albrecht had "[n]o complaints of chest pain, dizziness, palpitations, lower extremity edema, or shortness of breath." (*Id.*) Blair noted that Albrecht had a follow up chest x-ray, was scheduled for an echocardiogram on October 26, and was seen by Dr. Brescia, a cardiologist, on October 22. (*Id.*) The chest x-ray, the echocardiogram, and note from the appointment with Dr. Brescia are not in the record. Blair stated that the chest x-ray on October 8, 2010, was normal and she considered his heart problems to be "stable." (Tr. 283.) Albrecht did complain of lower back pain, left shoulder pain, and left hip pain. (Tr. 281.) Blair noted that x-rays were obtained and he was seen by Dr. Dervish for his chronic pain. (*Id.*) According to Blair, Dr. Dervish recommended physical therapy, which Albrecht was not receptive to and declined. (Tr. 281, 283.) Blair had prescribed Tramadol for pain management but there is no discussion of its efficacy because Albrecht was "really not interested in discussing his pain, as 'there is nothing [Blair] would do for [him] anyway.'" (Tr. 281.) According to Blair, "[b]asically, [Albrecht] wanted Vicodin, which was refused." (Tr. 283.) Finally, Blair stated that Albrecht still had BadgerCare for insurance. (Tr. 282.)

In addition to the records of Albrecht's various treatment providers, two consulting physicians provided opinions of Albrecht's residual functional capacity based on a review of the file. Dr. Sai. R. Nimmagadda completed the first opinion dated December 29, 2009. (Tr. 262–67.) Dr. Nimmagadda opined that Albrecht should be limited to occasionally lifting 50 pounds and frequently lifting 25 pounds. (Tr. 263.) He concluded that Albrecht was capable of standing and/or walking about 6 hours in an 8-hour workday and sitting for about 6 hours in an 8 hour-workday. (*Id.*) He

found no push or pull limitations. (*Id.*) Dr. Nimmagadda did provide for several postural limitations. (Tr. 264.) Dr. Nimmagadda did not find any manipulative, visual, or environmental limitations. (Tr. 264–65.) In his narrative comments, Dr. Nimmagadda stated that he found Albrecht's statements to be credible, his symptoms could be reasonably caused by his impairments, and gave great weight to the examining sources' opinions that he found to be consistent with the totality of the evidence. (Tr. 266.) He further stated that it appeared Albrecht's symptoms had "intensified" since March 2009 and he had degenerative disc disease and mild hip arthritis. (Tr. 267.) Dr. Nimmagadda also recognized that recent exams from 2009 indicated that Albrecht is "seeking narcotic pain meds for relief of symptoms" and "refused treatment with injections or other treatment measures." (*Id.*) Overall, he opined that a medium residual functional capacity with some postural restrictions was reasonable. (*Id.*)

Dr. Philip Cohen completed a second residual functional capacity assessment based on his review of the file on September 8, 2011. (Tr. 268–75.) According to Dr. Cohen, Albrecht could occasionally lift 20 pounds and frequently lift 10 pounds. (Tr. 269.) Albrecht was capable of standing and/or walking 6 hours and sitting 6 hours in an 8-hour workday with an unlimited ability to push and/or pull aside from the lifting restrictions. (*Id.*) Dr. Cohen opined that Albrecht had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 270–72.) In his limited narrative comments, Dr. Cohen stated that Albrecht had mild to moderate degenerative disc disease, especially at the L4-5 and L5-S1 levels, and mild degenerative joint disease in both hips. (Tr. 273, 275.)

The balance of the record are various statements by Albrecht regarding his impairments and accompanying symptoms. The earliest statement is a "Pain Questionnaire" dated November 11, 2009. (Tr. 150–52.) In the questionnaire, Albrecht claims that he started experiencing sharp pain

in his hip and back in 1998. (Tr. 150.) He states that the pain occurs all day long and that he takes hydrocodone three times a day but it only relieves the pain for 30 minutes. (*Id.*) He notes that there is no surgery scheduled and that he does not use any device to relieve his pain. (Tr. 151.) As for physical activities, he reports that the is able to do errands, light housekeeping chores, walk a half mile, stand for 90 minutes, and sit for 60 minutes at a time. (Tr. 152.) However, he needs assistance with lifting, bending, and carrying things. (*Id.*)

In an undated function report, Albrecht states that he is struggling to survive. (Tr. 172.) He cannot "[b]end, [l]ift, walk right, stand to [sic] long." (Tr. 173.) His pain affects his sleep. (*Id.*) According to the report, Albrecht does not prepare his own meals because he eats at the Salvation Army and does 15 minutes of cleaning a day. (Tr. 174.) His conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, seeing and memory. (Tr. 177.) He is able to walk four blocks with a rest and can pay attention for 30 minutes. (*Id.*)

A function report dated October 28, 2010, reiterates many of these problems and limitations. (Tr. 201–08.) Albrecht further reports that dressing, getting off the toilet, and tying his shoes are painful. (Tr. 202.) Albrecht states he does prepare sandwiches a few times per week, but notes that standing for too long is painful. (Tr. 203.) He also completes some housework, such as making his bed, doing dishes, and dusting, for about an hour per day. (*Id.*) He is also able to walk about a half mile before resting for five minutes. (Tr. 206.)

Finally, Albrecht completed a questionnaire on November 22, 2011. (Tr. 197–200.) In it, he notes that he used to have insurance through the state but it ran out. (Tr. 198.) Albrecht also states that he was working full-time for Menasha Packaging, but he needed to take four Vicodin a day in order to do so. (Tr. 199.) Once his doctor took him off medication in January 2011, he was unable to continue working. (*Id.*) He attempted to do so in October 2011 but he stopped because

of the pain. (*Id.*) He describes himself as having severe constant pain in his back and left hip when he walks, sits, bends, twists, stands, and lifts. (Tr. 200.) He also claims that "a tumor and hernia" cause him pain and he experiences pain in his chest and right arm due to his hearty surgery. (*Id.*)

SSA denied the initial application on June 19, 2010. After his application and request for reconsideration were denied, Albrecht requested an administrative hearing. The ALJ held a hearing on December 28, 2011. (Tr. 37–65.) Albrecht and a vocational expert testified at the hearing. (Tr. 40–65.)

During the hearing Albrecht testified about the symptoms that precipitated his heart surgery in 2010 and the treatment he received, which had been covered by his BadgerCare insurance. (Tr. 40–41, 47.) He indicated, however, that he no longer had BadgerCare because he was unable to afford the renewal payments. (Tr. 47.) He also testified that he has experienced pain in his heart since the surgery. (Tr. 41.)

Albrecht discussed his current living situation at a shelter called Father Carr's and described his responsibilities there, like putting away dishes and keeping his room clean. (Tr. 42.) His daily activities consisted of using the bus to "go by job service" to look for employment, eat lunch at the Salvation Army, and then go to the library. (Tr. 47.) Albrecht also stated that he did his own laundry. (Tr. 48.)

As for employment, he indicated that he had been working at Menasha Packaging but was "laid off right now" because "it got slow." (Tr. 43–44.) He had previously worked in the same position at Menasha Packaging until 2009 when he stopped because his doctor took him off his pain medication. (Tr. 44–45.) Without the pain medication, Albrecht stated that he would call in sick, and the company took him off the schedule. (Tr. 45.) Albrecht testified that he was unable to work full-time at Menasha Packaging because of the pain in his hip and back. (*Id.*) The same pain would

prevent him from doing a sitting job because "[a] variety of moving, sitting, and standing is even hard in life." (*Id.*) He did expect that he might go back to work at Menasha Packaging but "it's very part-time, especially with the economy." (Tr. 48.) When he did work there, it was typically for 8 hours a day but for a limited number of days in a week. (Tr. 57.) Even with medication, Albrecht described himself as "hunched over and limping" at the end of the day. (Tr. 58.) But he was able to "stay fairly focused" despite the pain. (Tr. 59.)

Albrecht disagreed with his doctor's conclusion that he had misused his pain medication. (Tr. 46.) According to Albrecht, an unidentified woman with whom he had been staying informed him that she had taken some of his pills. (*Id.*) Dr. Rocke, his then-treating physician, did not believe Albrecht's explanation and stood by his decision. (*Id.*) Albrecht indicated that he took tramadol and gabapentin, but he had reduced the amount on his own because he needed less medication when he was not working. (*Id.*) Albrecht denied any present consumption of alcohol, though he admitted to drinking the previous summer. (Tr. 47.) He reported that he had no side effects from his medications. (Tr. 57.)

Albrecht described fairly limited physical capabilities at the hearing. He claimed that he could only walk a few blocks and lift just 15 pounds. (Tr. 49–50.) He also described problems with sitting because of pain in his lower spine. (Tr. 50.) Walking was also difficult because of the deterioration in his hip. (*Id.*) In the average 12-hour block of time, Albrecht estimated that he would stand for about four hours and sit "[l]ike, three and a half, four hours." (*Id.*) He indicated that he did not lie down during the day. (Tr. 51.) He identified the pain as mainly concentrated in his lower spine and left hip. (*Id.*) He rated his back pain as an 8 and his hip pain as a 7 on a scale of 1 to 10. (Tr. 53.) Albrecht also described how he aggravated his hernia just five weeks after the initial surgery in 2005. (Tr. 55.)

The ALJ determined that Albrecht was not disabled.  (Tr. 27.)  The ALJ found that Albrecht met the insured status requirements and had not engaged in substantial gainful activity since April 1, 2009.  (Tr. 26.)  The ALJ found Albrecht had the following severe impairments: acute aortic dissection and aortic regurgitation, status post aortic valve replacement and dissection repair; degenerative arthritis of the spine and hips; recurrent inguinal hernia.  (Id.)

At step three, the ALJ determined that Albrecht's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpt. P, App. 1.  (Tr. 27.)  The ALJ then determined that Albrecht "has the residual functional capacity to perform light work as defined in 20 CFR § 404.1567(b) and § 416.967(b); specifically, the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently; sit/stand/walk 6 hours in an eight-hour workday; and, the claimant requires a sit/stand option."  (Id.)  With these limitations, the ALJ found at step four that Albrecht was unable to perform past relevant work.  (Tr. 30.)  At step five, however, the ALJ concluded that there are jobs in significant numbers in the national economy that Albrecht could perform, including order clerk and parking attendant.  (Tr. 31–32.)

Based on these findings, the ALJ concluded that Albrecht was not disabled within the meaning of the Social Security Act.  (Tr. 32.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Albrecht's request for review on February 4, 2013.  (Tr. 5–10.)  Albrecht then commenced this action for judicial review.

## STANDARD OF REVIEW

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to

support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### I. Credibility Determination

Albrecht argues that the ALJ's determination of his credibility is not supported by substantial evidence and failed to follow the applicable SSA rules and regulations. According to Albrecht, the ALJ failed to explain what objective evidence indicated that Albrecht's complaints of pain were incredible, ignored medical evidence that supported his complaints, and improperly relied on his limited daily activities as demonstrating an ability to work full time. (Pl. Br. 15–19, ECF No. 15.) Albrecht concludes that the "cumulative effect" of the ALJ's errors requires remand. (*Id.* at 24.)

14

An ALJ's credibility determination is entitled to "special, but not unlimited, deference." *Shauger*, 675 F.3d at 696. In assessing credibility, the ALJ must consider the factors set forth in the regulations and must support the credibility findings with the objective and other evidence in the record. 20 C.F.R. § 404.1529(c); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); SSR 96-7p, 1996 WL 374186 (July 2, 1996). The ALJ must provide an "accurate and logical bridge" between the evidence and the conclusion. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). In addition, "the ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). A court will not overturn an ALJ's credibility determination unless it is "patently wrong." *Id.*

Like many Social Security administrative decisions, the ALJ in this case used the oft-criticized "meaningless boilerplate" language. *See Roddy v. Astrue,* 705 F.3d 631, 635 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 921–22 (7th Cir. 2010). But the mere use of boilerplate language does not render a credibility determination inappropriate per se; it is the use of boilerplate without sufficient explanation that has been criticized. *See, e.g., Roddy,* 705 F.3d at 635, 638–39 (criticizing the use of "boilerplate" but holding that the ALJ erred by basing his credibility determination on an impermissible inference from failure to seek treatment and claimant's limited daily activities). It is deficient or absent reasoning by the ALJ, not "meaningless boilerplate," that requires remand. *Villano*, 556 F.3d at 562 (holding that the ALJ must supply "specific reasons" for a credibility finding).

Here, the ALJ provided a number of reasons for her conclusion that Albrecht's claims of pain were not fully credible: (1) objective medical evidence were normal or indicated mild problems; (2)

drug-seeking behavior; (3) activities of daily living; (4) ability to work part-time; (5) stopped working part-time due to lay off, not health; (6) no medication side effects; (7) sporadic treatment history; (7) refusal to follow treating medical provider recommendations. (Tr. 27–30.)

Credibility determinations are flawed when the ALJ fails to make a specific finding that enables the claimant and a reviewing body to understand the weight given and the reasoning applied to the claimant's statements. *Craft*, 539 F.3d at 678. Thus, on review, I look at whether the ALJ's credibility determination applied the factors from SSR 96-7p:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). In this case, the ALJ provided a variety of reasons that justified her conclusion that Albrecht was not credible.

For example, Albrecht testified that he did not experience side effects from his medications, (Tr. 57), despite his assertion to the contrary in his reply brief, (Pl. Reply 3, ECF No. 30). The ALJ accurately relayed Albrecht's testimony and drew a reasonable inference from the lack of side effects. Albrecht, on the other hand, misstates his own testimony at the hearing—he never testified that his

pain medication affected his ability to concentrate. Rather, he testified that his pain affects his ability to concentrate but that he could, nevertheless, "stay fairly focused." (Tr. 57–58.)

The ALJ's other reasons for discounting Albrecht's credibility are similarly supported by the record. First, multiple medical records are consistent with drug-seeking behavior over a lengthy period of time. (Tr. 252, 257, 260, 281, 286.) While Albrecht disagrees with the inferences that the ALJ drew from this evidence, he provides no case law that suggests the inferences were impermissible. To the contrary, the Seventh Circuit has noted that drug-seeking behavior in particular can be considered to reflect negatively on a claimant's credibility. *E.g.*, *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). Second, the record is clear that Albrecht went to Dr. Koch with the primary purpose of documenting his disabilities, not for treatment. (Tr. 241). Third, Albrecht also refused to consider non-narcotic treatment for his pain on several occasions, even when it appears that he had health insurance through BadgerCare. (Tr. 281–83.) Fourth, there is substantial objective medical evidence that Albrecht had mild to moderate degeneration of Albrecht's spine and hip, which the ALJ concluded were inconsistent with the severe, constant, disabling pain Albrecht described. (Tr. 247, 249–50, 284.) His various physicians uniformly prescribed conservative treatment—medication and physical therapy—based on the imaging done between 2008 and 2010. Finally, Albrecht testified that his most recent part-time work at Menasha Packaging ended because "it got slow," not because of his symptoms and impairments. (Tr. 44.) While this conflicts with the answers he provided in the November 2011 questionnaire, (Tr. 199), the Court does not substitute its judgment for that of the Commissioner by resolving conflicts in evidence or deciding questions of credibility. *Estok*, 152 F.3d at 638.

Albrecht particularly objects to the ALJ's reliance on Albrecht's limited daily activities and his ability to work full-time. While a claimant's daily activities are a factor to consider when

evaluating credibility, "this must be done with care." *Roddy*, 705 F.3d at 639. The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Id.* (citing *Bjornson*, 671 F.3d at 647; *Punzio*, 630 F.3d at 712; *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir. 2005); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)). Even if Albrecht were correct that the ALJ placed too much emphasis on these factors or impermissibly equated his ability to perform daily activities with significant limitations into an ability to do full-time work, the other reasons provided by the ALJ more than justify the determination of Albrecht's credibility.

In sum, the ALJ's articulation of her reasons for discounting Albrecht's account of the severity his symptoms is sufficient to allow the Court to follow the reasoning and to see the consistency between the ALJ's credibility determination and the evidence of record. *Nelson v. Apfel*, 131 F.3d 1228, 1237–38 (7th Cir. 1997). Rather than offer mere boilerplate or an empty recitation of the factors she was to consider, the ALJ referenced specific facts in the record that demonstrated the path of his reasoning. *See McKinzey*, 641 F.3d at 890 ("[T]he ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record."). In light of the deference owed the ALJ, no more is required. The ALJ's conclusion based on this record is not unreasonable and is certainly not patently wrong.

## II. Assessment of the Medical Evidence

Albrecht next argues that the ALJ erred in giving substantial weight to the opinions of Dr. Cohen and Nurse Practitioner Blankenheim. First, Albrecht contends that the opinion of Dr. Cohen was not entitled to substantial weight because he rendered his opinion without the benefit of

Albrecht's medical records related to his heart surgery and post-operative care with Aurora. (Pl. Br. 22, ECF No. 15.) He argues that the content of these records supported his claims of chest pain following the procedure. (*Id.*)

It is true that Dr. Cohen did not have the benefit these later records when he provided his residual functional capacity assessment. However, these records do not support any further limitations than those found in Dr. Cohen's assessment and adopted in the ALJ's opinion. In fact, the additional records somewhat contradict his claims of chest pain, as Nurse Practitioner Blair noted that he complained of "chest discomfort with exercise" on October 1 and then no chest pain on October 25. (Tr. 281, 288.) A chest x-ray from October 8 was also normal according to Blair. (Tr. 283.) And even the limitations that Albrecht suggests might have been indicated like strenuous lifting, pushing, or straining, (Pl. Br. 22), these limitations were already incorporated into the ALJ's decision with the lifting restrictions imposed for other reasons, (Tr. 27). As a result, any error in relying on Dr. Cohen's opinion that was rendered before these final medical records were available would be harmless.

Second, Albrecht identifies that the ALJ erred in placing "great weight" on the medical recommendations of Nurse Practioner Blankenheim because it was actually Dr. Saletta that opined that Albrecht should not lift more than 15–20 pounds until his hernia was repaired. (Pl. Br. 23.) Albrecht is correct that the ALJ's opinion is in error. Dr. Saletta recommended the limitations based on his examination of Albrecht on March 17, 2009, not Nurse Practioner Blankenheim. (Tr. 245.) It was during this exam that Dr. Saletta noted a "definite bulge that extends to the external ring and is tender on palpation but very easily reducible" and diagnosed a recurrent right inguinal hernia. (Tr. 246.) Dr. Saletta further advised Albrecht not to do any heavy lifting—more than 15 to 20 pounds—until the hernia was repaired in an elective surgery. (*Id.*)

But like the ALJ's reliance on Dr. Cohen's opinion, the error is harmless. If anything, the fact that Dr. Saletta, a treating physician and hernia specialist, provided the opinion suggests that it was entitled to "controlling weight" under SSA regulations. An ALJ must give controlling weight to treating source opinions that are "well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 404.1527(c)(2); *see also Punzio*, 630 F.3d at 710. More weight is given to the opinions of treating physicians because they have greater familiarity with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870. If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

But the ALJ did not discount the weight of Dr. Saletta's opinion, she placed "great weight" on it and incorporated the lifting restriction into the residual functional capacity. (Tr. 26, 30.) A lifting restriction that was, it should be noted, consistent with the opinion of Dr. Cohen, (Tr. 269), and more restrictive than the opinion of Dr. Nimmagadda, (Tr. 263). Thus, the ALJ came to the right result in relying on the content of Dr. Saletta's lifting restrictions, but she did so without identifying the proper rule regarding the weight given to the opinions of treating physicians when they are not inconsistent with the record. 20 C.F.R. § 404.1527(c)(2). Any error is harmless as a result.

### III.  Sit/Stand Option

Finally, Albrecht argues that the ALJ should have provided more detail regarding the frequency of the sit/stand option to the VE. According to Albrecht, without the frequency with which Albrecht required the ability to sit or stand, the VE could not provide an opinion on the availability of unskilled jobs. (Pl. Br. 23–24.) Albrecht contends that he may have been precluded

from performing the jobs identified by the VE at the hearing if, for example, he needed to sit or stand frequently. (*Id.*)

But as the Commissioner argues, Albrecht had the opportunity to cross-examine the VE at the hearing regarding the sit/stand option, its frequency, and the availability of unskilled jobs with this limitation. (Tr. 62–63.) He chose not to do so. Moreover, the VE was present for the entire hearing, heard Albrecht's testimony about his limitations including his ability to sit or stand, and was sufficiently familiar with his claimed limitations as a result. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). There is also no authority supporting Albrecht's assertion that the frequency of the sit/stand option must be specifically discussed. The SSA ruling cited by Albrecht does not require that the ALJ must specify the frequency with which one must be able to sit/stand. SSR 83-12, 1983 WL 31253, at *4 (1983) ("Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base."). The ALJ complied with the ruling by consulting with the VE because Albrecht was limited to unskilled jobs. Indeed, the very idea of a "sit/stand option" implies that the disability claimant may alter his or her position as necessary and is not restricted to a certain number of transitions from one position to another. Finally, absent some indication that the result would be different, the Court will not remand the decision so that the ALJ can clarify the sit/stand option to be "at will" and have the VE repeat the same testimony. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) ("[W]e give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it.") (internal quotations and citation omitted); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Therefore, the Court concludes that the ALJ did not err in failing to specifically state the frequency of the sit/stand option. Even if the ALJ's omission was an error, it would be harmless.

## CONCLUSION

In this case, the ALJ adopted the most restrictive limitations that were provided in any of the opinions of the medical providers, including those who treated Albrecht, in determining the appropriate residual functional capacity. While Albrecht disagrees with the ALJ's ultimate conclusions, they are supported by substantial evidence in the record, including the opinions and records from his treating physicians. Further, the ALJ provided a "logical bridge" between the evidence and her conclusions. *Clifford*, 227 F.3d at 872. Any errors in following the SSA rulings and regulations by the ALJ were harmless.

Accordingly, and for the reasons set forth above, the Commissioner's decision is affirmed. The Clerk is directed to enter judgment in favor of the Commissioner forthwith.

Dated this 2nd day of September, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court